EASTERN DIST.
*March,* 1840.

MUNICIPALITY NUMBER TWO *vs.* HENNEN.

APPEAL FROM THE COURT OF THE FIRST DISTRICT, JUDGE
BUCHANAN, PRESIDING.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

14 L 559
49   586

The remedy given to the owner of property to prosecute the *folle enchère,* or purchaser failing to comply with his bid, is commutative. He may elect to prosecute the purchaser for a specific compliance with the terms of sale, or for damages, or he may proceed to a re-sale, at the *risk* of the first purchaser.

The vendor, in prosecuting the *folle enchère,* cannot *recover the difference* between the first and last sale, if he bids in his own property.

So the legal owner, or mandatory of the owner, who is alone interested in a sale at auction, is equally incompetent to purchase property at such sale ; and so far as the *folle enchère* is concerned, the sale is null and void.

This is an action to recover the sum of forty-one thousand five hundred dollars from the defendant, as the difference between the first and second sales of certain property bid in by him, and re-sold at his risk, for the alleged refusal to comply with the condition of the first sale.

The record shows, that on the 29th August, 1836, the Second Municipality entered into an agreement with the Messrs. Frerets, and Messrs. Debuys, and others, for the purchase of a square and a half of ground, on which their cotton presses then stood, on certain conditions, the most material of which were, that the property should be divided out into small lots, and sold at public auction. The municipality guarantied to the vendors, that the property should bring at least three hundred and seventy-five thousand dollars, and the municipality entitled to receive whatever amount was over. The sellers guarantied and made the titles to the purchasers, and received in payment endorsed notes, at one, two, three, four and five years, with six per cent. interest per annum, and secured by a special mortgage on the property.

This property was put up at auction the first of February, 1837, after having been duly advertised, with the terms

EASTERN DIST.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

and conditions of sale, as "the property of the Second Municipality." At this sale, D. N. Hennen, the defendant, bid off seven lots, for the aggregate sum of ninety-two thousand five hundred dollars. The plaintiffs allege, that the defendant failed and refused to comply with the terms and conditions of sale, although the titles to the lots in question were tendered to him. On the 1st February, 1838, the property purchased by Hennen was sold by order of the municipality, at the risk of Hennen, when T. W. Collens became the purchaser of part thereof, and the municipality of the balance. On the 9th May following, that purchased by Collens was re-sold at his and Hennen's risk, and bought in by the Second Municipality. The difference between the price bid by Hennen at the first sale, in February, 1837, and the price at which the property was bid in by the municipality at the last sales, made at his risk, is forty-one thousand five hundred dollars, for which this suit is brought, and for which judgment is prayed against the defendant. The defendant admits the first sale to him, as the highest bidder, for ninety-two thousand five hundred dollars, but denies that the plaintiffs were the vendors, or could legally own said property; that they have no cause of action, and none exists against him; but avers, that if any claim can arise out of the sale of February, 1837, against him, or cause of action, the same vests in and belongs to those who were the owners of said property, and who were to give title to the same. He further avers, that he did offer to the owners to comply, in every respect, with the terms of said sale, and require of them a title in conformity therewith, but that they refused to comply with said adjudication; that so far from being put in default or delay by the plaintiffs for failing to comply, he did all in his power, or that the law could require, to carry said contract into effect.

The defendant further avers, that from the refusal and neglect of said parties to carry said contract into effect, he considered it at an end, and that he has now the right to have it rescinded and annulled; that the plaintiffs can, in no event, have any claim against him for damages, inasmuch

as they, or the owners of said property, failed to put him in default by offering to make a legal title thereto; and, by not fulfilling any of the requisites of the law, he denies that the property was legally sold at his risk and cost. On the contrary, he avers, there are manifest errors and illegalities in all the proceedings had to effect said pretended sale at his risk. He prays, that the original sale and adjudication be declared illegal and cancelled, and that the plaintiffs' demand for damages be rejected.

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

Upon these issues, the cause was tried before a jury.

The plaintiffs produced, in evidence, the agreement between them, and the Frerets and Messrs. Debuys and others, for the sale and purchase of the ground and cotton presses mentioned, and also the advertisements, terms and conditions of the sale of February 1, 1837. They also showed, that the acts of sale were drawn up by their notary for the defendant to sign. Mr. Freret, who was to make the titles, attended the notary's office at the hour indicated, and the defendant failed to appear, having been there before the hour fixed, or designated by himself. Notice that the acts were prepared for his signature, was then given *in writing by the notary*, the 17th September following the sale. The defendant declined accepting or signing the acts of sale. Evidence of the re-sale, by the municipality, at Hennen's risk, and the *purchase*, at said sale, by the municipality, at half the original price, was given. The defendant offered no evidence.

Upon the evidence and pleadings, after hearing the arguments of counsel, the jury returned a verdict for the plaintiffs, and, after an unsuccessful effort to obtain a new trial, from judgment, confirming the verdict, the defendant appealed.

*Carter* and *Benjamin*, for the plaintiffs:

1. On this statement of facts the first question that presents itself is this: What was the nature of the contract between Frerets and the municipality? We are not aware that there is any reason why this contract should be called

Eastern Dist.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

by any particular name, nor classed in any particular category ; legislative foresight has not gone so far as to provide particular classes within which must necessarily be embraced all contracts to which the endless variety of human affairs can give rise.    We must, therefore, be content to remain subject to the sarcastic remarks of the defendant's counsel, and humbly confess that this is a contract of which we have been able to find no counterpart in any books that we have consulted ; that it is *sui generis.*

That it possesses many features of a sale is most undoubted ; that thereby an equitable interest in this property became vested in the municipality, and a right to control its disposal to a certain extent is equally clear ; but that they were the purchasers of the property in the full sense of the word we do not admit, because it was expressly stipulated that no title was ever to become vested in them ; that the property was to be sold by the Frerets at public auction, and titles passed by them to the purchasers at public auction ; and that the Frerets, and not the municipality were to receive the price of the public sale.    True, if this price exceeded a certain amount, the surplus was to be paid by them to the municipality : Why ?  As a consideration for the guarantee of the municipality, that the price should not fall short of this fixed limit.    Who were to pay the price to Frerets ?  Not the municipality, but the purchasers at the public auction.    The municipality were to have nothing to do with passing the title ; and it was expressly agreed that they were to be subject to no guarantee ; but inasmuch as the gain or loss resulting from the sales exceeding a certain limit, or falling short of it, was to fall on them, they were invested with the control of the sale.

2. Defendant contends : 1st. That the property has not been legally alienated ; and on this point he relies on the 11th section of the act of 17th February, 1821, requiring the assent of two-thirds of the city council to an alienation of real estate ; the law does not state, as defendant's brief would seem to imply, "that this fact must appear affirmatively by their records, and cannot be presumed." This latter

clause is a mere inference of defendant, or an exposition of
what he understands to be the correct principle on this
subject.    On this point it might, perhaps, be sufficient to
observe that the law quoted is inapplicable to the present
case ; that this is not the case of a municipal body attempting
to alienate the public property ; but an agreement with indi-
viduals that they shall break up an establishment pronounced
to be a public nuisance, and sell out the property in lots, so as
to promote the improvement of that part of the city where
these establishments were situated.    This case is so clearly
out of the whole scope and spirit of the enactment, which is
a safe-guard, thrown by the legislature around the real estate
owned by the municipality, to prevent ill-advised and doubtful
measures tending to the too easy squandering of its resources,
that a simple statement of the facts of this case would seem
to afford an ample refutation of this ground of defence.    But
the interests of the municipality and of others to an immense
amount are involved in the decision of this question, and its
importance must form our excuse for going more into detail,
than would be required merely for the purposes of the present
controversy.

The records of the proceedings of the council, at repeated
sessions, have been offered in evidence, and through a long
series of deliberations it is shown by those records, that the
sale of the property in question was ordered and ratified by
resolutions stated to be passed ; the records stating also
that all the members were present.  These records are signed
by the Recorder.  It is contended that this is not sufficient,
because the ayes and nays were not recorded, or, in other
words, that this court must presume, contrary to the statement
on the records, that these resolutions were not passed ; for, if
it required a vote of two-thirds to pass them, and that num-
ber did not vote affirmatively, they were not passed, but
rejected.    We contend that the presumption of law is, that
the proceedings of public officers are regular till the contrary
appears ; that a party impeaching the regularity assumes the
burden of proving the irregularity, which is an affirmative
susceptible of proof; that the records are conclusive evidence

EASTERN DIST.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

that these resolutions were passed; or, if not, at all events such *prima facie* evidence as to throw on the defendant the burden of proof, that four members voted against them, this number being necessary to defeat them in a council composed of ten members.

On this point we cite " *Angell & Ames on Corporations,*" 128 to 158, and the authorities there cited. Adams *vs.* his Creditors, *ante* 454.

3. The defendant denies having been legally put in default. The whole of his argument on this point is based on a mistake. His statement of facts is incorrect. He omits to notice his own letters of 25th April and 5th July, 1837. In these letters, it is explicitly avowed by him that he had been requested to comply with the terms of sale. The whole doctrine of putting in default is one purely technical, having no bearing on the real merits of a controversy; and was so considered by this court, when it reluctantly adjudicated the case of Erwin *vs.* Fenwick, 6 *N. S.*, 230, in favor of defendant. Our law does not require any particular form for that purpose, 3 *Louisiana Reports,* 385; and a party may, by changing a passive into an active breach of contract, waive the necessity for putting him in default; as in the case of Kelly *vs.* Caldwell, 4 *Louisiana Reports,* 40, where the party, called in to comply with his contract, answered, that "he considered it at an end." So, in the present case, Hennen having agreed to furnish the endorsement of Lea and Penn, and having procured that of the former, deposited the notes with the notary, that they might be endorsed by Penn and delivered to his vendors; but unable to procure Penn's endorsement, he, as shown by his letter of 5th July, withdrew the notes from the notary, and thus actively violated his contract, which active violation rendered a putting in default unnecessary; but the whole correspondence and evidence of Freret, J. B. Marks and J. Marks, will satisfy the court that he was repeatedly required to comply with the terms of sale, and always refused. But we are told that the acts of sale were not signed by the municipality, nor was their warranty tendered. This is so mere a quibble, that we could not

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

believe it would be seriously insisted on in this court. By the public advertisements, the purchasers were notified that they were to receive their titles and their guaranty from Frerets. Defendant contends that this meant from Frerets and the municipality. It would not be going too far to hazard the assertion, that not an individual in the city of New-Orleans, who read the advertisement, was deceived as to its meaning; that no one person who bid at the sale expected a deed to be offered by the municipality, or that the defendant himself ever dreamed of such a demand till his counsel found it out for him in this suit. The words of the advertisement are such as to exclude such an idea, if taken as the code requires, in their usual sense, without attending so much to grammatical rules, as to general and popular use : *Civil Code*, 1941. But if defendant was entitled to the warranty of the municipality, by the terms of the auction sale, he had a tender of it ; for, by the acts offered to him, signed by Freret and others, at page 59, it is stated, that the property is conveyed to him by virtue of the adjudication at auction, and in conformity with it ; so that, if this adjudication entitled him to the warranty which he now requires, he received it.

It is proper to observe, that, when called on to comply with the terms of sale, Hennen did not require any warranty from the municipality ; that he expressed no dissatisfaction with the deed tendered ; that he merely, by his letter to Freret, stated that he wanted some information about the title ; and finally, that even by his very answer filed in the suit, he expressly disclaims to have contracted with the municipality ; and yet is now contending that he did contract with them, and relied on their warranty. They are so palpably and absurdly inconsistent as to require no comment.

This court, by the decision in Stewart *vs.* Paulding, has decided that the tender of an act of sale was necessary to put a party in default in proceedings *à la folle enchère ;* but it did not, and could not, sanction a doctrine so fraught with pernicious consequences, so favorable to parties in bad faith seeking to evade their obligations, as to decide that, if a bill of sale be tendered, and no objection made as to its sufficiency,

EASTERN DIST.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

the party to whom it is tendered can afterwards escape his responsibility by picking flaws and searching for irregularities till then unnoticed.

The case of a legal tender is perfectly analogous. Such tender can only be made in gold or silver; yet it is well settled, that if payment be offered in bank notes, and no objection be made at the time, the legality of the tender cannot afterwards be disputed.

4. We next arrive at the third ground of defence, viz: That the property was not re-sold in strict compliance with the terms of article 2589, of Civil Code, that it is a forced alienation of property, and that all the forms of law must be strictly pursued.

If necessary in this cause, we think it would not be difficult to show that defendant is mistaken in the opinion that the proceeding technically known as the *folle enchère* is a forced alienation of the property of the bidder at the first sale.    True it is, that by article 2586, the adjudication is the completion of the sale, and vests title in the highest bidder; but this is conditionally, on the event of his complying with the terms of sale, for if he fail, article 2589 considers the sale to him as null, " as if the first adjudication had never been made." The vendor re-sells his property, not that of the bidder in default, and the difference in price between the two sales *is a simple* measure of damages, conclusive between the parties, because made in such a way as to offer a fair test of these damages. When, therefore, a vendor sues on the proceeding à la folle *enchère*, he does nothing more than claim damages which have become liquidated in a certain manner.. This is the true nature of the *folle enchère*, and will be more fully developed in another portion of our argument.

Let us now see under our law, whether the formalities prescribed by article 2589 have been complied with : 1st. The property was advertised during ten days, and sold, on the 11th.   It was first advertised on the 22d January.   It was sold on the 1st February.   It was, therefore, advertised eleven days, counting the first and last, or ten days, excluding one of the extremes.   On the 1st February, when the property

was sold, it had been advertised full ten days, viz: the ten last days of the month of January. In a ten days advertisement, three insertions suffice, but the advertisement was inserted nine times in one paper, and ten times in the other. See *Civil Code,* 1110.

EASTERN DIST.
*March,* 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

We now come to the question as to the construction of that part of the article which authorizes a re-sale, at the end of ten days and after the customary notices. There is no doubt that the construction contended for by the defendant is correct so far as this, viz: that the word *and* being a copulative conjunction, is cumulative in its meaning, and that both a ten days delay and customary notices are required. Now, in all sound grammatical construction, where two members of a phrase are connected by the copulative conjunction, the order of the members may be reversed, and the meaning remains the same; in this case, to arrive at the true meaning, let us reverse the order in which the members of the phrase are placed, and then the reading would be this " the seller after the customary notices and at the end of ten days may again expose for sale ;" or, in other words, if the bidder does not pay the price as required, if he is put in default, the vendor must make the usual advertisements and sell at the end of ten days ; the ten days are the term during which he is to advertise, the nature or kind of advertisement is directed to be the customary notices, *i. e.,* in towns where newspapers are printed, the notices must be through the public gazettes; in parishes where no gazettes are printed, the notices must be such as are customary in those parishes. There is no article of the code directing *all sales* of immoveables when required by law to be advertised during thirty days. Whereever the law requires a thirty days notice it expressly says so, as in the different cases of forced sale suggested in defendant's brief ; the article of the code to which reference was no doubt made, was the article 1108 ; but this strengthens the construction we contend for, showing that what the legislature meant by usual or public notices, was notices posted up at the public places ; the word usual referring to the manner of advertising, not to the duration of advertisement.

EASTERN DIST.
*March,* 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

5. But we are told that the terms of the first sale were changed. How? That at the first sale, which took place on the 1st February, 1837, the property was sold at a credit of one, two, three, four and five years from that date; at the second sale, which took place on the 1st February, 1838, the property was sold at the same credit from the same date. The defendant says that we sold as " if the first adjudication *had been made.*" Here again is sophistry, which a little examination will soon make evident. What is the meaning of the words " as if," &c.? Simply this, that the fact of the first adjudication, which, by article 2586, vests title, shall not prevent a re-sale, if the purchaser fail to comply, but that this re-sale shall take place " as if," &c.; but on what terms? Clearly as at the first sale. What were the terms of the first sale? Equal instalments, payable on the 1st February, 1838–9–40–1–2. These were precisely the terms of the second sale. True, at the date of the second sale one term had already become due; but this cannot change the construction of the law, which must be interpreted in the same way, whether the new sale took place a month or a year after the first. A question may, indeed, and does arise, whether we are guilty of *laches* in deferring the second sale a year; but this is another and different question. The construction we give is obviously the only just one. The vendor who exposes property for sale, specifies such terms of credit as his circumstances allow him to offer. He knows at what periods he will need the price, and fixes them. The bidder causes the property to be adjudicated to himself, and then fails to comply with his contract. Is it not clear that it could never have been the intention of the lawgiver that the vendor should be at the mercy of the faithless purchaser, who, by combining with others, might protract *ad infinitum* the term of payment, and defeat the disposal by the vendor of his own property on his own terms? An interpretation leading directly and inevitably to such a result as this, can never be sanctioned.

6. But we are accused of *laches,* of not having re-sold the property within a reasonable time. This is a question which

was not put at issue in the court below, and we had not prepared ourselves with testimony especially directed to this point. Fortunately, however, the evidence in the record, and facts of public notoriety, will convince this court that the jury were amply justified in negativing this charge. The record shows that Hennen continued to amuse the plaintiffs with propositions for settlement and compliance with the terms of sale, till late in the summer of 1837. The purchase was made by him in February of that year. The commercial distress which still pervades our community commenced (and this is a fact of which the court will require no proof,) in the month of March, 1837, and increased in severity each successive day. On the 25th April, we find Hennen, by his letter, still professing a readiness to settle. We find him depositing notes, which, by agreement, were to be endorsed by M. G. Penn, in the notary's office, with the ostensible intention of completing the sale: And we afterwards find him, on the 5th July, actively violating his contract, by withdrawing the notes which his vendors were to have received. If, at this date, at a period when the danger of sickness drives from amongst us a large portion of our population, the municipality had pursued its *folle enchère*, no terms would have been found by defendant strong enough to reprobate the unwarrantable severity, as he terms it, of their proceeding. And because they did not insist on an immediate sale ; because their indulgence extended to him a delay of a year ; because a period was selected, in the midst of the winter, one deemed the most favorable for public sales ; because a reluctance was shown by this corporation to resort to harsh measures before exhausting, without avail, all amicable means, we are told that we were guilty of *laches*, and lost our remedy. This was a question peculiarly subject to the cognizance and decision of a jury, and they thought that there was no *laches*, and this court will concur with them in opinion. The manner in which the plaintiffs' rights were asserted, was rather favorable to defendant than otherwise, although it could not be expected that he would be satisfied with our measures, however

EASTERN DIST.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

lenient, as any that we might adopt must necessarily have resulted in a heavy loss to him.

7. But the objections to our proceedings under this article are not yet exhausted. We are told that we had no right to buy in the property, that it was our own, that we cannot be vendor and vendee, that, consequently, there was no second adjudication, and, therefore, that our measure of damages, as provided by this article, no longer exists, and that the verdict of the jury, based on this measure, must fall, being unsupported by evidence, when this basis is withdrawn. In aid of this position, and of the incapacity of plaintiffs to bid at the sale, the cases of Baham *vs.* Bach, 13 Louisiana Reports, 287, and of Scott's Executrix *vs.* Gorton's Executor, 14 Louisiana Reports, 111—115, are relied on.

The former of these decisions is too obviously correct to be questioned by us. In the eloquent language cited by the judge who delivered that opinion, " the principles on which it is based are the noblest principles of morality and justice, principles calculated to preserve honesty between man and man." What, then, is the decision in the case of Baham *vs.* Bach ? That the owner of a property offered for sale at public auction, has no right to bid at the sale, unless he publicly reserves to himself that right. Why ? Because his conduct is such as to raise, in the minds of the bystanders, false impressions as to the real value of the property : because it is a fraudulent artifice, inducing them to make higher bids : because the seller thereby profits at the expense of the purchaser to the full amount of the enhanced bid elicited by this fraudulent artifice. Compare with this decision, and the reasons on which it is based, the situation of the vendor, who exposes property at the *folle enchère ;* a proceeding, the true nature of which is merely, as we have already shown, the fixing a *measure of liquidated damages,* to be paid by the first purchaser, for his breach of contract. Does the vendor, by bidding at this second sale, and giving more for it than any one else, profit at the expense of the purchaser, or does he not, on the contrary assist him in diminishing the measure of damages ? If this were a question between third persons,

EASTERN DIST.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

who came to bid at the sale, and the municipality, they might with some appearance of justice, invoke, in their support, the decision of Baham *vs.* Bach, but when the defendant, in the *folle enchère,* complains that the vendors were the highest bidder, he complains that a lower bid was not taken, or, in other words, that the damages charged against him are not heavy enough. We conclude, that the case of Baham *vs.* Bach, in its principles and reasoning, is entirely inapplicable to that now before the court.

In the case of Scott's executrix *vs.* Gorton's executor, however, this court did decide that the vendor at the first sale could not bid at the *folle enchère.* That this cause was correctly decided we do not presume to question, as its circumstances were such as fully to bear out the court in its decision, independently of the point now under discussion ; but we will respectfully suggest to the court some considerations, which induce us to believe that the opinion expressed, that plaintiff could not recover in that case, because the vendor had bid at the *folle enchère,* is not supported by law. The first fact to which we will advert in support of this position is, that the legislature in its provisions on this subject, anticipated the presence, at the *folle enchère,* of the parties to the first adjudication, and confines its prohibition against bidding " to the purchaser at the first sale and his agents." We shall be answered that this can only be, because in the nature of things, the vendor could not be the purchaser of his own property, and, therefore, no prohibition against bidding was necessary as to him. But the argument on this subject contains a sophism which must be exposed before we can arrive at a correct conclusion ; this sophism is based on confounding the *highest bidder* at an auction sale with the *purchaser.* No law prohibits; and the decision in Baham *vs.* Bach, expressly recognizes the right of a party to bid at a public sale of his own property, provided he publicly reserves to himself that right ; the vendor then may honestly and fairly have his own property stricken down to him as the highest bidder. Now, if the object of the *folle enchère* be, not to enforce a second alienation of the property, (for this was a matter of indifference to the lawgiver, and must

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

be so to the purchaser,) but to fix the amount of damages, the whole reasoning which dictated the decision in Baham *vs.* Bach, as well as that in Scott *vs.* Gorton, is inapplicable, for the object of the second adjudication, viz : the ascertaining the highest value of the property at the re-sale is as well and fairly attained by the vendor's becoming the highest bidder as any other person.

8. The defendants have exhausted all their ingenuity to satisfy the court that this is a forced sale ; that the auctioneer is a public officer, merely replacing the sheriff; and that the rules of law applicable to forced sales must govern.    If this be so, our right to bid was very clear, for *article* 688, *Code of Practice*, provides, in express terms, that a debtor may himself bid for his property offered for sale under an execution, and so may the judgment creditor ; and yet, if defendant's counsel be correct, this is an absurdity in the very nature of things, for a man's property cannot be sold to himself.    No, but it may be adjudicated to him as highest bidder, and then the auction results not in a sale, but, as it were, in a kind of forced appraisement of the value, showing the extreme price that can be obtained for it.

But even if the court adhere to its decision, in the case of Scott *vs.* Gorton, the circumstances of this cause are such as present a necessary exception.    True it is, that, by the agreement with the Frerets, equitable interest in this property was vested in the municipality ; but that agreement expressly provided that the titles were to be transferred by them to the purchasers at the auction sale.    Now, the title of the municipality to the property was not complete till an adjudication to them at auction, and the adjudication, far from being a sale of their own property to themselves, was necessary to perfect their title.

The argument on this head is based, on our part, on the assumption, that the *folle enchère*, in its nature, is not a forced alienation of the property of the bidder at the first sale, but a mere measure of damages.    On this point, there is a consideration which strikes us as conclusive, drawn from the law itself.    If this be a forced alienation of the property of the

EASTERN DIST.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

first bidder, as contended for by plaintiffs, and not a means of liquidating damages as contended for by us, how is it possible that the legislature could ever have sanctioned the absurdity that, under such hypothesis, would be presented by the last clause of article 2589 ? "If a higher price is offered for the thing than that for which it was first adjudged, the first purchaser has no claim for the excess." What! authorize a forced alienation of a man's property and withhold from him the price after the sum due is paid? No; such is not the legislation on the subject. The whole context of these articles shows that our construction is correct; and, as this subject is now, for the first time, presented for decision, we confidently expect a decree sanctioning this construction.

One word more as to this auction sale. Independently of the presumption of law, we have positive testimony on the record, as to the real damages. By article 1928, of Civil Code, the damages due to a creditor for a breach of contract, are the amount of the loss which he has sustained, and the profit of which he has been deprived. By the testimony of Mr. Peters and of Mr. Cenas, it is shown that Hennen bid no more at the first sale than the current market value of the property, and that if he had not been present, it would have been sold to other bidders for substantially the same price; and that, on the re-sales, the property brought its full value at the date of these re-sales. Can any comment on this testimony be necessary to show actual deprivation of profits suffered by the municipality through Hennen's default, to the full amount claimed in this suit?

9. We now come to the last position assumed by the defence, i. e., that the title to this property was in the Frerets, that they alone can be considered as the vendors, and as entitled to the remedy by the folle enchère, which it is contended is a personal right, inherent in them and not susceptible of alienation. That this objection is, at the best, one of mere form, more in the nature of a dilatory exception than a defence on the merits, is evident; its effect, if sustained, being merely to drive plaintiffs, to a fresh action to be instituted by the Frerets for their use; and if a dilatory exception,

EASTERN DIST.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

it cannot be sustained, because waived by the defendant going to trial on the merits without objection.

In examining the right of a party to institute a suit, or to claim a particular remedy, the first and most natural question which suggests itself is this: in whom is vested the interest which gives rise to the suit? If tried by this test, the municipality and not the Frerets are the real parties in interest. What is the nature of the present claim? A demand against defendant, that he shall make good the price of the first adjudication, by paying the deficiency resulting from the fact that the second sale produced a smaller sum. It is in reality a part of the price of the first adjudication which we claim. Now, by the terms of the agreement between the Frerets and the municipality, such part of the price of the first sale was to be paid to the latter, as might remain after the former had received a certain fixed amount; and by the testimony on file it is shown that the Frerets were paid in full out of other proceeds, leaving to the municipality the claim against Hennen for the total amount of the adjudication to him. Here, then, is a full and complete assignment by the Frerets to the municipality of the total amount due by Hennen, so that if the claim in question be in its nature assignable, we must recover.

*Grymes* and *Eustis*, for the defendant:

I. To enable the plaintiffs to recover in this action, they must establish:

1st. That the property was legally alienated by the plaintiffs.

2d. That the defendant, Hennen, has been legally put in default, according to article 1905 and 1907, of the code.

3d. That the property re-sold at his. risk has been sold in strict compliance with the requisites and formalities of the law, necessary in such forced alienations of property.

4th. That they have a right of action, founded on a *legal* interest in the subject matter set forth in their petition, as the *owners* of the property purchased by Hennen on the 1st of February, 1837.

The answer of the defendant put the whole matters at issue.

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

The defendant has introduced no evidence on the trial below, and relies confidently on the want of such a showing by plaintiffs as will enable them to recover in law.

Following the foregoing propositions in their order, we propose to show, that the plaintiffs have failed to establish any of said propositions; and,

I. The property has not been legally alienated.

By the 11th section of the act of 17th February, 1821, two-thirds of the members composing the council are necessary to an alienation of real estate, which fact must appear affirmatively by their records, and cannot be presumed from the attendance of any number of members. *See City Laws, page 325.* We also refer to the senate journals of the United States, *passim.* Such, also, is the usage in the Municipality No. 2, for the ayes and nays are taken on the question of sale on the second of August, 1836, and two-thirds did not assent; yet the records of the council assert that the resolution has passed.

II. The defendant has not been legally put in default.

To establish the converse of this, the plaintiffs rely on the letter of the notary, addressed to the defendant, September 17, 1837, stating to him that the *acts of sale were ready for his signature.*

By the article 1905, of the code, a debtor is put in default by the *act of the party,* either by the commencement of a suit, *demand* in writing, verbal requisition in the presence of two witnesses, or by a protest by a notary public.

Article 1907, of the code, is as follows : " In *commutative* contracts, where the reciprocal obligations are to be performed at the same time, or the one immediately after the other, *the party who wishes to put the other in default* must, at the time and place expressed in, or implied by the agreement, *offer* or *perform,* as the contract requires, that *which, on his part, was to be performed,* or the opposite party will not be legally put in default.

It is apparent that this letter, as a demand in writing, does

EASTERN DIST.
*March,* 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

not *emanate* from, or is it the *act of* a party to the contract. *Article* 1905.

It does not profess to be done for, and in behalf of either the municipality, or Freret, brothers, or the Debuys.

On the trial of the cause, the notary deposed that he wrote it at *the request of the comptroller.*

The comptroller is an agent of the municipality. It has not been shown how his powers can extend to such an act, nor whether a demand on him would be sufficient default against the municipality. Whatever doubts may exist on this point, there can be none on the position we assume, that the comptroller had no authority, by law, to delegate his authority to another. " *Delegata potestas non potest delegari,*" is the maxim of the common law, and the maxim of the civil law is: *Procuratorem alium procuratorem facere non posse. Digest, lib.* 14, *tit.* 1, *l.* 1, §5. *Ibid., lib.* 49, *tit.* 1, *l.* 4, §5.

The default being, by our law, a pre-requisite to the recovery of damages, a pre-requisite for the dissolution of the contract, and for the exercise of that highly penal remedy given by article 2589, of the code, operating by a forced alienation, at once a dissolution of the contract, and as a measure of damages, can it be seriously pretended, that such a writing, emanating from an individual who has no character as agent of the parties by virtue of his office, professing to act for no one, can be called, in words of the article 1905, the act of the party ? And let us ask here, for what party does it profess to act ? Would a verbal requisition, in the presence of witnesses, made by a third person, in terms similar to the above, be deemed sufficient to carry, with all the legal consequences of a default ?

But this letter, in the words of article 1907, does not contain an offer on the part of the creditor " to perform that, which, on his part, was to be performed." It announces, that the certain acts of sale had been drawn up by Mr. Marks, and that he demanded from Hennen to "comply with the terms of sale." Has he stated who the vendors are ? or has he made either an offer, or tendered a title to the defendant ? See the cases of *Wilbor* vs. *M'Gillicuddy,* 3 *La. Rep.* 385. *Stewart* vs. *Paulding,* 5 *Idem,.* 154.

Eastern Dist.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

2. " The statement of facts in the present case, does not show that any act of sale, in writing, was passed, or offered to be passed, by the seller.   The only testimony adduced on this subject, is that of the auctioneer, who testified that the defendant, when requested by him, refused to comply with the terms of the sale.   But this was not sufficient to put him in default, according to the article 1907, of the code above cited, for the plaintiff did not offer to perform that, which, on his part, was to be performed, viz : to make the deed of conveyance."

Such also, is the doctrine of the common law :   " It seems to be a general rule, that the vendor of an estate cannot sue the vendee on the contract to purchase, unless he, the vendor, has not only shown or offered to show a good title, if bound so to do, but has executed the conveyance, or offered to execute it, or tendered it to the vendee ; for the party seeking to enforce an agreement of this nature must clearly evince and notify a willingness to complete it on his part, before the other patry can be considered in default. *Chitty on Contracts*, 245 ; *Jones* vs. *Barkley Doug.*, 634 ; *Phillips* vs. *Fielding*, 2 *Hen. Black.*, 123 ; *Hawkins* vs. *Kemp*, 3 *East*, 443 ; *Wilmot* vs. *Wilkinson*, 6 *B. and C.*, 506 ; *Sugden on Vendors*, 8 ed., 230–235.

3. The publication, terms and conditions of the sale are made by the municipality, as owners of the property.   They are the vendors and bound to perform all the obligations and formalities as such.

We are told that Messrs. Freret, brothers, are to give us a full guarantee of the title.   We have assented to it ; but we hold the municipality bound, as seller, to that warranty which the seller cannot escape, the warranty for the price paid, in case of eviction, even admitting that there is no other warranty.

Article 2479, of the code, says :   " The parties may, by particular agreement, add to the obligation of warranty which results of right from the sale, or diminish its effect ; they may even agree that the seller shall not be subject to any warranty."

73    VOL. XIV.

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

Article 2481 : " Even in case of stipulation of no warranty, the seller, in case of eviction, is liable to a restitution of the price, unless the buyer was aware, at the time of the sale, of the danger of eviction, and purchased at his peril and risk."

The municipality being the vendors, could they put the defendant legally in default until they had tendered him such an act of sale as he was entitled to—a deed divesting them of their title—setting forth to him and the world by whom the property was sold, and who was bound to restore the price in case of eviction, and who only was bound to the the warranty, for the fruits, revenues, costs and damages?

If the object adjudged is an immoveable or slave, for which the law requires that the act of sale shall be passed in writing, the purchaser may retain the price, and the seller the possession of the thing, until the act be passed. Article 2588, of the code, found under the head of "Sales by Auction."

The same principle is laid down in the case of Long *vs.* French, 13 Louisiana Reports, page 260. This was a suit instituted " to compel the defendant to execute a conveyance of the property by authentic act, and to recover damages."

The evidence of the sale consisted in an agreement in writing, signed by the parties ; the judgment of the inferior court, ordering the defendant to make an authentic act was affirmed. There are several other decisions to the same effect, and this is the usage in all cases of sales of immoveable property.

In the argument of the cause in the inferior court, the plaintiffs have been driven to a denial that the municipality purchased, or ever owned the property in dispute, in direct contradiction of the allegation, that they purchased, in their petition. They have maintained that the contract of August 29, 1836, was a contract of guarantee ; a contract of agency ; a compromise ; a contract *sui generis.*

It is not conceived to be at all important to the merits of the present controversy, to settle this point, whether the municipality were the owners of the property sold to defendant on the 1st February, 1837. The obligations of the plaintiffs as vendors ; the obligations and rights of the defendant

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

as purchaser, are not to be affected by any private agreements or contracts between Freret, brothers, and the plaintiffs; the true nature and character of the contract between the parties to this suit is to be found in the terms, conditions and announcements at the sale, to which alone, on the adjudication, the defendant has given (the essential part of a contract) his consent.

Following the plaintiffs in their last position, that the municipality were not the owners of the property on the 1st February, 1837:

If they sold the property of Freret, brothers, as a sale of another's property, it was a nullity, (*Civil Code, article* 2427) a nullity enacted for the benefit of the purchaser. Admitting, for the argument, that they were not the owners; that the title was vested in Freret, brothers, on the 1st February, 1837, the article 1833, of the Civil Code says: "No one can, by a contract in his own name, bind any one but himself or his representatives; but he may contract in his own name that another shall ratify or perform the stipulation which he makes, and in this case he shall be liable in damages if the contract be not ratified or performed by the person for whose act he stipulates."

This last article corresponds to the article 1120, of the Code Napoleon, the former to article 1599, of the same code.

The sale of another's property in the manner pointed out by the latter article, is considered by all the commentators on the code as valid and not embraced in the nullity enacted by article 2427. 1 *Troplong, Vente*, 380; 16 *Duranton, No*. 180; 10 *Ibid., No*. 218.

The question then arises, is the seller of another's property bound to guarantee?

We contend that he is bound to the warranty.

What is the contract of sale? it is defined by our code, article 2414, perfect by the concurrence of three circumstances, a thing sold, a price, and the consent.

By article 2431: "The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller as soon as there exists an

EASTERN DIST.
March, 1840.

MUNICIPALITY
NO. TWO·
vs.
HENNEN.

agreement for the object and for the price thereof, although the object has not yet been delivered, nor the payment made." *Merlin's Rept. de Jurisprudence, verbo Vente, section* 1, *article* 1–3 ; *Pothier, Vente, No.* 7.

4. We come now to the next and last inquiry, has the property sold at the defendant's risk been legally alienated?

We contend that the sales at the defendant's risk on the 1st February, 1838, and 9th May, 1838, were not made and conducted in pursuance of, and in compliance with the formalities of the law.

The article 2589, authorizing sale at the risk "*or folle enchère*" of the purchaser who fails to comply with the terms of sale, is as follows :

"In all cases of sales by auction, whether of moveables or of slaves or immoveables, if the person to whom adjudication is made does not pay the price at the time required, agreeably to the two preceding articles, the seller at the end of ten days, and after the customary notices, may again expose to sale the thing sold, as if the first adjudication had never been made ; and if, at the second crying, the thing is adjudged for a smaller price than that which had been offered by the person to whom the first adjudication had been made, the latter remains a debtor to the vendor for the deficiency, and for all the expenses incurred subsequent to the first sale. But if a higher price is offered for the thing than that for which it was first adjudged, the first purchaser has no claim for the excess.

And we contend :

1. The sale, "*a la folle enchère*," is not a voluntary, but a forced sale ; that the above article is to be strictly construed.

2. This sale can only be made by the seller. It is a right strictly personal ; and if assignable, (supposing Frerets, as contended on argument, to be the sellers,) no such assignment to the municipality appears on the record.

3. That the sales have not been made on the same terms and conditions as at the original sale ; that they have not been made "as if the first adjudication had never been made."

4. That the customary notices or advertisements have not been made.

EASTERN DIST.
*March,* 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

Our code, under the head of "Sales at Auction," commencing with article 3579, speaks of the sale at auction as voluntary, when the owner himself offers his property for sale in this manner; forced, when the law prescribes this mode of sale for certain property, such as minors, &c. Article 2580.

On this sale " *a la folle enchère,*" the original purchaser cannot bid directly or indirectly : Article 2590. He is bound for the loss by difference in the re-sale, and for the expenses, but can derive no possible benefit by the chance of a higher price.

By the adjudication, the sale was completed, and the purchaser became the owner of the property. Article 2586.

And yet, we are told by the plaintiff's counsel that this is not a forced sale ; not a forced expropriation of the defendant's property. It is difficult to imagine in what manner it can be considered as a voluntary sale by the owner of his own property, when he must stand by at a sale, conducted by the seller, with a prohibition of law against his bidding directly or indirectly.

A more rigid penalty for the accidents or folly which may prevent a purchaser from fulfilling his contract, cannot be found under any system of laws.

5. If the defendant had been legally put in default, what remedies had the plaintiffs? 1st. To sue for a specific performance of the contract. 2d. To sue for its rescission. 3d. And in either case to sue for damages. 4th. The sale " *a folle enchère.*"

A remedy at once operating a dissolution of the contract and establishing the measure of damages ; not a tardy remedy, to be made effectual through the intervention of the courts, but a remedy summary, of a highly penal nature, in the hands of the creditor; he has made his election, and the defendant asks only from this court the little protection which the law has thrown around his rights and interests, in the strict and legal interpretation of this remedy.

Referring to article 2589, it is obvious that the remedy cannot be exercised until ten days after the party has been put in default. The ten days begin from the default ; "at

EASTERN DIST.
March, 1840.
═══════════
MUNICIPALITY
NO. TWO
vs.
HENNEN.

the end of ten days" refers to the words " time required," which precede. There is not a word said as yet about advertisements to which the word " end" can have reference. There are sound reasons in the law, that this extraordinary remedy should not be enforced until ten days have expired from the default. Then follows, " at the end of ten days and after the customary notices, &c. The word " and," here used, is cumulative in its meaning. It is not that the creditor may proceed, &c. " at the end of ten days or after the customary notices," the debtor is to be entitled to the delay of ten days, " and" (in addition to) the customary notices before the sale shall take place.

In the case now before the court, the record shows (see advertisements,) that the property was advertised on the 22d day of January, and sold on the 1st of February, 1838, being nine intervening days, Sunday included.

We understand by customary notices, in reference to sale of immoveables, the notice required by the Code of Practice during thirty days, for sales of immoveables in successions, sales under writs by sheriffs, sales of minors' property, &c. There is and can be no customary notices in sales of real estate by individuals, guided only in matter of notice by caprice or interest. This we conceive to be the only meaning that can give the law effect.

The sale "*a la folle enchère*" is one of the amendments of the old code, enacted in 1825. No such remedy was known under the old code, (see head " Sales at Auction," old code.) What was the meaning of the legislature when these amendments were adopted, speaking of customary notices? They could not have had a reference to notices customary in sales *a folle enchère*, which did not exist? They evidently meant the customary notices we contend for, to wit : in sales of successions, sales by syndics, and other forced sales.

The plaintiffs contend that the advertisement during ten days is sufficient ; has the property been sold after ten days advertisement ? No.

The advertisement appeared in the Bulletin on the 22d
January, in the Bee on the same day ; in the Bulletin it was
published but nine times, including both days, in the Bee ten
times, including both days. But the days of sale and the first
day of advertisement are both to be excluded. *McDonough*
vs. *Gravier's Curator*, 9 *Louisiana Reports*, page 545.

" *After* thirty days cannot mean *within* that period, which
would take place in the present instance if both the days of
advertising and sale be included in the calculation of time."

*En cas de vente par folle enchère le delai prescrit par l'article*
739 *C. Pro* : *entre l'apposition des placards et la première publi-*
*cation : doit être de* 15 *jours francs.* *Dalloz*, 1828, 2d *part*,
*page* 176.

The advertisement must be complete in two newspapers.
*Laws of* 1837, *page* 69.

The sales of 1st February, 1838, and May 9, 1838, were
not made on the same terms and conditions as the first sale,
or, " as if the first adjudication had never been made."

At the original sale (1st February, 1837,) the terms were
one, two, three, four and five years credit ; on the re-sales of
1838, the property is sold at one, two, three, four and five
years credit *from the* 1*st February*, 1837, making it, virtually,
at one-fifth cash, and the balance at one, two, three and four
years, a sale made " as if the first adjudication had been
made," and not complied with.

As the words preceding " may again expose to public
sale," authorize *the sale*, the words that follow, " *as if*," &c.,
refer to the manner, to the terms. It is not conceived that
language could convey a meaning more clearly, or that a
greater deviation from the law could have been made, than
that in the present instance.

The vendor had his choice ; to sue for specific performance ;
for a dissolution ; and for damages ; to commence the pro-
ceedings in a sale " *a la folle enchère*," after ten days, from
default. The delay is justly chargeable to his own *laches*.
They ought to have exercised the remedy within a reasonable
time.

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

*Bullard, J.,* delivered the opinion of the court.

The facts which led to the present controversy, so far as it is necessary to recapitulate them, are substantially as follow : that in August, 1836, the Second Municipality entered into an agreement with the Messrs Frerets and others, the owners of certain cotton presses and the ground on which they were erected, within the limits of that corporation, that they (the proprietors) would sell to the municipality that property, which it is not necessary particularly to describe, on condition that the whole should be divided into lots and sold by the municipality on a long credit, payable in annual installments, with interest at six per cent. They were to receive three hundred and seventy-five thousand dollars, to be paid as will be hereafter mentioned. The municipality was to be put in possession as early as the 10th September, and within a time limited by the agreement, the plaintiffs were to cause the whole to be sold at public auction, for notes to be endorsed to the satisfaction of the vendors, together with collateral notes for accruing interest. The vendors agree to take the notes thus given in payment, the principal with the interest being considered as cash, and the municipality not to be responsible for their ultimate payment. It was agreed further, that should the proceeds of the sale be less than the aforesaid sum, then the deficiency was to be made up by the municipality. The vendors bound themselves to furnish the purchasers of the lots good and sufficient titles, it being understood that the municipality was not to warrant the titles to the purchasers.

Such is substantially the original agreement between the municipality and the proprietors of the ground, in pursuance of which the sale of the lots took place. The whole amount of sales was five hundred and seventy thousand seven hundred dollars, leaving a profit, after paying the price stipulated, of one hundred and ninety-five thousand seven hundred dollars in favor of the municipality, and it is shown that the original proprietors have been entirely satisfied, independently of the price of the lots now in controversy in this case.

At the sale by public auction, of the lots in question, the defendant became a purchaser for a large amount, and having

as is alleged, failed to comply with the conditions of the sale though legally put in default, they were exposed for sale at his risk, and the present action is brought to recover the difference between the first and second adjudication, to wit: forty-one thousand five hundred dollars. At the second sale, the municipality became the highest bidder and purchaser of the lots. We leave out of view an intermediate exposure of the property at which Collens became the nominal purchaser of a part of the lots.

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

This proceeding took place in virtue of article 2589, of the code, which provides that in all cases of sales by auction, if the person to whom the first adjudication is made does not pay the price at the time required, &c., the seller at the end of ten days, and after the customary notices, may again expose to public sale the thing sold, as if the first adjudication had never been made; and if, at the second crying, the thing is adjudged for a smaller price, than that which had been offered by the person to whom the first adjudication was made, the latter remains a debtor to the vendor for the deficiency, &c. It is further provided, that if the property should sell for a higher price, the first purchaser has no claim for the excess; and that the first purchaser is not permitted to bid either directly or through the intervention of a third person.

The answer of the defendant denies the ownership of the plaintiffs, and their right to maintain the present action. He denies having been put legally *in morâ* by offering to make him a legal title to the property, or by fulfilling any of the formalities of law. He denies that any of the property was legally sold at his risk, but avows on the contrary that there are manifest errors and irregularities. The defendant finally claims that the adjudication to him of the 1st of February, 1837, be cancelled and annulled.

There was a verdict and judgment in favor of the plaintiffs for the amount claimed in the petition, and the defendant appealed.

In this court the case has been argued with distinguished ability on both sides, and we have had all the aid which professional learning, or acumen could afford us. Little light is

EASTERN DIST.
*March*, 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

derived, it is true, from adjudicated cases under this provision of our code or that of France, which is somewhat analogous, although believed to be restricted to cases of forced sales by judicial authority; and we are left to put a construction upon this part of the code guided by those general principles which govern all contracts, and especially that of sale at public auction, and at the same time those principles which ought to prevail when resort is had to summary and extraordinary remedies.

The remedy given to the owner of property to prosecute the *folle enchère*, or purchaser failing to comply with his bid, is cumulative. He may elect to prosecute the purchaser for a specific compliance with the terms of sale, or for damages, or he may proceed to a re-sale, at the risk of the first purchaser.

It seems to be conceded on all hands, that the remedy given to the owner to prosecute the *folle enchère* is cumulative; that he may elect either to prosecute the purchaser for a specific compliance with the terms of the sale, or for damages by the ordinary action, or may proceed to a re-sale, at the risk of the first purchaser, under the restrictions provided by the code. Such re-sale, at which the first purchaser is not permitted to interfere either directly or indirectly, and which may never turn to his profit, fixes the measure of liquidated damages which the delinquent purchaser is bound to pay. The remedy, therefore, is certainly summary and severe, and ought to be confined to cases clearly coming within the provisions of the law, and in which all the previous conditions have been complied with, and the second sale conducted fairly and legally. It is equally clear that the remedy is given to the vendor alone. He only is spoken of in the code; he alone is injured by the failure of the first purchaser to comply with the terms of the adjudication. Every suit, therefore, prosecuted for the recovery of the damages thus liquidated, involves a threefold inquiry. 1st. Whether the plaintiff be the party injured, or the vendor. 2d. Whether he has complied with the conditions required of him, by law, by putting the first purchaser in default and thereby entitled himself to prosecute the *folle enchère*; and 3d. Whether the re-sale has been preceded by the requisite notices, and conducted fairly and legally.

In the case now before the court, the first branch of the inquiry leads us to look into the contract between the Messrs. Frerets and others, and the municipality, which has been

much discussed during the argument. The first question which presents itself in relation to that contract, is not how it is to be classed, whether as a sale, or a power to sell, coupled with an agency, but whether its object was lawful, and the contract itself binding between the parties, and not reprobated by law; and next, whether it vested in the municipality such an interest and right as to entitle it to maintain the present action. At the time the last sale at public auction took place, the Messrs. Frerets, and others, had been fully paid and satisfied for the price of the whole property; and, consequently, although still bound to execute conveyances, and to warrant towards the purchasers of the lots, yet it was quite immaterial to them for what price any particular lot might be sold. They had nothing more to receive. The result of the second sale, concerned the municipality alone. The corporation, and none other, could gain or lose by the re-sale of the lots purchased originally by the defendant. The contract, such as it is, was between the original proprietors, and the municipality appears to have accomplished an object of public utility without being obnoxious, so far as we can perceive, to any serious objection. Whether the persons are to be regarded as vendors directly to the municipality of the entire property, or as promising to become such for particular parts of it to such persons as might purchase at a public sale, to be conducted by the municipality at its risk, does not appear to us important to inquire in the present case.

The view we have taken of the last branch of inquiry, to wit: the manner in which the last sale was conducted, and the property adjudicated to the municipality, renders it unnecessary to inquire whether the public notice was sufficient, and whether the sale was preceded by such steps as the law requires to put the first purchaser in default. Conceding to the plaintiffs the advantage of a substantial compliance with all the legal pre-requisites, upon which we express no positive opinion, we come to what we regard as the principal question in the case: Was the auction conducted legally, and was the municipality competent to become a bidder and a purchaser?

Eastern Dist.
March, 1840.

MUNICIPALITY
NO. TWO
vs.
HENNEN.

EASTERN DIST.
*March,* 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

Even admitting, for the sake of the argument, that the Messrs. Frerets were the real vendors at the auction sale, what was the true position of the municipality? The Frerets had nothing more to receive for whatever amount the lots might be sold; and, consequently, whatever amount may have been bid by the municipality, nothing was to be paid. The corporation was manifestly a nominal bidder, not a serious one. It was immaterial so far as its treasury was concerned, whether it bid one dollar or one thousand. If that corporation was not already vested with the legal title, at least it may be said that the original proprietors had nothing more to claim from it on account of the price. If, under these circumstances, the property had been adjudicated to a third person, and it was discovered that the municipality had been permitted to bid, and the purchaser had refused to comply with the terms of the sale, and insisted on treating the sale as null, on the authority of Baham *vs.* Bach, 13 *Louisiana Reports,* 287, and the principles therein recognized as governing sales of that kind, how could the cases be distinguished; or upon what principles could he be said to be bound, unless it was previously known that the corporation had reserved the right to bid? How can such a bid be distinguished from a false bid, or offer, which is reprobated by the law? If, under such circumstances, the person to whom the property may have been adjudicated, would be entitled to relief *à fortiori,* should the adjudication not be conclusive upon one against whom it operates like the verdict of a jury in assessing damages for the non-performance of a previous contract?

This objection has been very ingeniously answered by the counsel for the plaintiffs. We give his own words. "What then is the decision in the case of Baham *vs.* Bach? That the owner of a property offered for sale at public auction has no right to bid at the sale, unless he has publicly reserved to himself that right. Why? Because his conduct is such as to raise in the minds of the bystanders, false impressions as to the real value of the property; because it is a fraudulent artifice, inducing them to make higher bids; because the

seller thereby profits at the expense of the purchaser, to the full amount of the enhanced bid elicited by this fraudulent artifice. Compare with this decision, and the reasons on which it is based, the situation of the vendor who exposes property at the *folle enchère;* a proceeding, the true nature of which is merely, as we have already shown, the fixing a measure of liquidated damages to be paid by the first purchaser for his breach of contract. Does the vendor, by bidding at this second sale, and giving more for it than any one else, profit at the expense of the purchaser, or does he not, on the contrary, assist him in diminishing the measure of damages? If this were a question between third persons who came to bid at the sale, they might, with some appearance of justice, invoke in their support the decision of Baham *vs.* Bach, but when the defendant, in the *folle enchère,* complains that the vendors were the highest bidders, he complains that a lower bid was not taken, or, in other words, that the damages charged against him were not heavy enough."

This is certainly specious and imposing; but the fallacy, we think, consists in overlooking the important consideration, that if any fictitious bid be permitted, there is not a fair competition, and the person to be affected by such sale has a right to insist upon all the bidders standing on the same footing; all equally liable to pay, and that every bid should be a serious one. The objection is, that it would discourage bidders, and, therefore, not fair. The party so to be affected might well ask, who would bid against a person who, in consequence of previous arrangements with the vendor, is in no event to pay any thing, even if the property should be nominally adjudicated to him? But the argument at the same time proves too much; it would prove that the first purchaser would have a right to complain that even the owner himself purchased at the *folle enchère,* and that a sale null in itself for want of competent contracting parties, is yet valid so far as it goes to fix the measure of damages against a party who had no right to interfere for his own protection. To such a proposition we are by no means prepared to assent. On the contrary, this

EASTERN DIST.
*March,* 1840.

MUNICIPALITY
NO. TWO
*vs.*
HENNEN.

EASTERN DIST. court after much consideration, and two arguments, sanctioned
*March*, 1840. a very different doctrine in relation to the sale *a la folle enchère*,
in the case of Scott's Executrix *vs.* Gorton's executor, and
STATE held that the plaintiff could not recover the difference between
OF LOUISIANA
*vs.* the prices at the two adjudications, because the last sale was
JUDGE OF THE
COMMERCIAL void for want of competent contracting parties, the execu-
COURT. trix who had provoked the sale, being the last purchaser.

The owner of 14 *Louisiana Reports*, 116.
property, in pro-
secuting the *folle*      In the case now before us the corporation finds itself in a
*enchère*, cannot
*recover the diffe-* dilemma ; if it was not the vendor it has no right to main-
*rence* between
the first and last tain this action ; and if it was, then it could not become the
sale, if he bids
in his own pro- purchaser of its own property. It is difficult to imagine
perty.
So, the legal what new title the municipality acquired by the adjudication.
owner, or man-
datory of the It was already in possession ; the whole price had been paid,
owner, who is
alone interested and the original proprietors were bound to warrant the title.
in a sale at auc-
tion, is equally But whether we consider the municipality as the legal owner
incompetent to in a strict sense of the word or not, it is certain that, that corpo-
purchase pro-
perty at such ration alone was interested in the result of the sale at auction,
sale ; and, so far
as the *folle en-* and whether owner, or sole mandatory of the owner, was
*chère* is con- equally incompetent to purchase, and that the sale so far as
cerned, the sale
is null and void. the defendant is concerned is void.

It is, therefore, adjudged and decreed, that the judgment of
the District Court be avoided and reversed, and that ours be
for the defendant as in case of a non-suit, with costs in
both courts.